W. G. CRANDALL et al., Appellees, v. E. E. TROWBRIDGE et al.,
Appellants.

**PROCESS:** Service—Fraud in Securing—Jurisdiction. Service of
process secured through the trickery, deceit or fraud of a party
or those acting for him, does not give the court jurisdiction.
Record reviewed and held to show that jurisdiction attached—
that no fraud had been practiced.

*Appeal from Clay District Court.*—HON. N. J. LEE, Judge.

WEDNESDAY, JANUARY 20, 1915.

REHEARING DENIED FRIDAY, MAY 7, 1915.

ACTION in equity to cancel notes given by the plaintiffs,
one of which was for $1,200.00 and endorsed to defendant
Swenson, the other for $2,500.00, endorsed by Swenson to
Gillespie, and by him endorsed to the Peoples Savings Bank,
of Spencer, Iowa. Defendants were not all served and there
was no appearance for some of them. Defendant Swenson, who
is the appellant, is a resident of Nebraska. Service of original
notice was made upon him by the sheriff of Clay County on
October 28, 1912, at Spencer, Iowa. He appeared specially
for the purpose of objecting to the jurisdiction of the court
and moved to set aside the return and service on the ground
that he was induced by the fraud of plaintiffs to come to
Spencer for the purpose of enabling plaintiffs to serve the
notice upon him there. The hearing was had upon affidavits
and oral examination of some of the persons making affida-
vits. Appellant's motion was overruled, and he appeals.—
*Affirmed.*

*Alvin F. Johnson* and *Helsell & Helsell,* for Swenson,
appellant.

*Faville & Whitney,* for plaintiffs, appellees.

*W. W. Cornwall,* for defendants, First National Bank and Peoples Savings Bank.

Preston, J.—With the merits of the controversy between plaintiffs and defendants, we have nothing to do on this appeal. There has been no general appearance, or plea to, or trial upon the merits, except that the Savings Bank has filed an answer. The appearance by defendant Swenson was under Par. 4, Chap. 162, Acts of the Thirty-Fourth General Assembly. The question is, whether plaintiffs practiced a fraud upon appellant, as alleged. It is almost entirely a question of fact. The fraud alleged is, that the presence of appellant in Clay County, Iowa, was procured by plaintiffs upon the representation that if he would come to Spencer, Iowa, he would there have delivered to him an automobile as payment of the $1,200 note of plaintiffs which Swenson held, and by plaintiffs' concealing from him certain facts which, if he had known, would have caused him not to come within the jurisdiction. Appellant says his presence in Iowa was not voluntary; that plaintiffs' purpose was unknown to him. If the presence of appellant in Iowa was procured by trickery, deceit, or the fraudulent and wrongful acts of plaintiffs, or those acting in their behalf, the court did not obtain jurisdiction, and in that case the motion to quash should have been sustained. Appellant cites upon this point: *Dunlap v. Cody,* 31 Iowa 260; *Mooney v. U. P. R. Co.,* 60 Iowa 346; *Toof v. Foley,* 87 Iowa 8; *Mahoney v. Insurance Co.,* 133 Iowa 570; *Allen v. Wharton,* 59 Hun. 622, 13 N. Y. Sup. 38; *Townsend v. Smith,* 47 Wis. 623; *Van Horn v. Great Western Mfg. Co.,* 37 Kans. 523; *Wood v. Wood,* 78 Ky. 624; *Chubbuck v. Cleveland,* 37 Minn. 466; *Wauzer v. Bright,* 52 Ill. 35; *Heston v. Heston,* 52 N. J. Eq. 91; *Battelle v. Youngstown, etc.,* 84 Tenn. 355; *Frawley v. Casualty Co.,* 124 Fed. 259; *Cavanaugh v. Manhattan,* 133 Fed. 818.

Plaintiffs both signed the notes and were interested in

1. Process: service: fraud in securing: jurisdiction.

the California land deal, and were investigating the facts to make defense. They are each chargeable with the acts of the other, or their attorney, as to the service of notice in the action by plaintiffs. *Toof v. Foley, supra.*

It is the claim of appellant that plaintiffs had been planning to have Swenson come to Iowa in order to serve him with notice, and that they concealed such purpose from him. There is no other claim of concealment. If such was not their purpose, then, of course, there was no concealment of it. The evidence, which will be later pointed out, shows that until after Crandall had the conversation with Gillespie on the morning of October 28, and when Crandall supposed Swenson had already started to Spencer, there was no intention to sue Swenson, consequently no fraud or concealment.

Fraud and fraudulent intent and purpose may be inferred from the acts and representations of the parties and all the facts and circumstances shown. *Bean, etc., Mfg. Co. v. Standard Spoke Co.,* 131 Fed. 215. But as between honest and dishonest motives and purposes, we should presume honesty of intent and purpose unless the facts and circumstances are such as to satisfy the mind that the acts and statements relied upon are fraudulent or dishonest.

The legal propositions seem to be settled, so that it is unnecessary to discuss the cases. We do not understand counsel for appellees to controvert the legal propositions in appellant's authorities before cited. They contend, however, that under the evidence there was no fraud or unfairness, and that appellant came voluntarily to Spencer, Iowa. After a careful examination of the record, we are of opinion that the position of appellees ought to be sustained.

Without going too much into detail, we shall state the more important facts appearing in the record. Although the hearing was of a motion, supported by affidavits, with counter-affidavits, the record is voluminous for such a case, and there is necessarily more or less repetition. The facts are, in the main, without substantial dispute, although there

is some conflict as to some of the details which we shall endeavor to point out. To better understand the situation, we shall briefly state the claim of plaintiffs in the action. It is, in substance, that about May 25, 1912, plaintiffs and another contracted for the purchase of land in California; that thereunder $8,700.00 would be due August 1, 1912; plaintiffs were unable to meet the payment, and in August, defendant Trowbridge represented that defendant Swenson would advance that amount of money if plaintiffs and Trowbridge would execute their note for that amount, which plaintiffs agreed to, and did, do. The note was delivered to Trowbridge for Swenson as security for the money to be furnished by Swenson; that later, in August, 1912, Trowbridge and Swenson represented to plaintiffs that Swenson had forwarded $8,700.00 to the person in California, to whom it was due, and had accepted as security therefor the note of plaintiffs and Trowbridge, but informed plaintiffs that the note was too large for Swenson to handle and that Swenson desired to have smaller notes given in lieu thereof; that this was done at the request of Swenson, and three new notes of $5,000.00, $2,500.00 and $1,200.00 were given; that Trowbridge, Swenson and one George Gillespie conspired together to induce plaintiff to execute the $8,700.00 note; that Swenson had not agreed to furnish the money; that Swenson had not sent any money to California, and that the statement that it had been done was false. The $1,200.00 note, endorsed by Trowbridge to Swenson, and still held by him at the time this suit was brought, and the negotiations for its payment, are involved in this appeal. The $2,500.00 note is held by defendant Savings Bank, and it has answered, claiming to be an innocent holder.

We shall state the substance of the affidavits and testimony bearing upon the alleged fraud by which appellant claims plaintiffs induced him to come to Iowa. October 4, 1912, plaintiff, Crandall, sent appellant a telegram making inquiry whether he would be at home the next day. Appellant replied by telegraph from Nebraska that he would be at home.

The next day, Mr. Heald, of Spencer, Iowa, an attorney for plaintiffs, saw Swenson at his home in Nebraska. It is shown by the affidavit of appellant, and not disputed by appellees, that at this time Mr. Heald maintained a friendly attitude towards appellant and stated that plaintiffs might have some financial difficulty in meeting some of the notes on the date of their maturity, and that Crandall had recently purchased an automobile, which he desired to sell to appellant and have the purchase price apply as a payment of the $1,200 note held by appellant; appellant stated to Heald that he would consider Crandall's proposition and requested Heald to have Crandall send a detailed description of the automobile; that Heald also stated that plaintiffs desired to enlist appellant's services in disposing of the land for which the notes had been given. October 15th, Crandall wrote a letter to appellant referring to the conversation between appellant and Heald in regard to procuring appellant's assistance to sell the land and in regard to the sale of the automobile, stating further that he expected to go to Council Bluffs the next Saturday night, and suggesting that appellant meet him Sunday to go over the matters. October 18th, appellant answered by letter and wire that he would be unable to meet Crandall as suggested, but in the letter stated that he would be glad to meet him at any time in Council Bluffs or Omaha, and that he would be pleased to be of service in helping dispose of the California land; he again asked for a detailed description of the automobile. October 22nd, Crandall wrote appellant a second letter, again referring to the land and requesting appellant to meet him in Omaha to discuss the matter. On the same date, Crandall also wrote appellant a letter giving a description of the automobile and stating that he would sell the same, fully equipped, for $1,275.00, adding that he (Crandall) would drive the car to Omaha and turn it over to appellant if appellant would meet him the following Sunday. On the same day, Swenson wired Crandall, addressed to Spencer, Iowa, that he would pay $1,200.00 for the automobile if

Crandall would drive the car to Omaha. October 25th, Crandall wired Swenson that he would meet him at the Hinshaw Hotel in Omaha Sunday morning. On Sunday, October 27th, appellant went to Omaha and met Crandall and Heald pursuant to the arrangement, and he says that he expected to receive the automobile at Omaha and surrender the $1,200 note; he testifies by affidavit that at this time Crandall stated that he had decided definitely to sell the car for $1,200.00 and take the note. Crandall did not take the car to Omaha, and appellant says that Crandall requested appellant to go to Spencer and get the car. Appellant says that Heald and Crandall stated to him that they had started with it from Spencer, but were compelled to turn back and go by rail because it was windy and appellant's eyes were weak. Crandall and Heald qualify this statement somewhat and deny that they said they had started with the car, but Crandall says that he did not drive the car because it was a big undertaking for him on account of his eyes and the wind, and further, that he did not feel justified in driving it so far, not knowing whether he could make the deal for the car. As to this matter there is a flat contradiction, by both Crandall and Heald, of appellant's affidavit, that they had agreed to exchange the car at $1,200.00 for the note. Their testimony is to the effect that Crandall wanted $1,275.00 for the car and that he never told appellant that he had decided definitely to sell the car for $1,200.00; that Crandall told Swenson that he could go to Spencer and look at it, and Crandall would arrange with Heald to turn the car over at any price that Swenson and Heald might agree upon; that Crandall told Swenson that he was going to California the next day and that Mr. Heald was going back to Spencer that night and asked him to go back with Heald, but that Swenson said he could not go to Spencer before the next morning; that he told Swenson that any deal he made with Heald would be satisfactory, and that Swenson said he would go up and look at the car. He says that, as he understood it, the train that Swenson would

leave on the next morning would leave Omaha at 7:45.   Appellant states that he told Crandall on the 27th that he would leave for Spencer on an afternoon train the next day, but that in fact he did start from Omaha at 10:55 the next morning; that he arrived in Spencer about 8:00 o'clock P. M., October 28th, and says he immediately telephoned to Heald that he had arrived, and requested Heald to come down to the garage and instruct those in possession of the automobile to deliver the same and that the note would be delivered to Heald; that Heald replied it was too late to close the deal that night and stated that he would come down in the morning; that about thirty minutes after this conversation the notice was served upon appellant.   The car was not delivered. Appellant says that his purpose in going to Spencer was to exchange the note for the automobile; that he had no other business to transact at Spencer or anywhere in the state; that he would not have gone to Spencer or into the state except for the misrepresentations and deceit.   He says that since said time he has learned that for some time prior thereto Crandall and Heald had been making inquiries and investigations in regard to the transfer of the notes to him and that the friendly attitude towards him assumed by them was feigned and for the purpose of deceiving him and procuring his presence within the jurisdiction.

An important feature of the case is a conversation had between Heald and defendant, George Gillespie, at Omaha on the morning of October 28th, shown by the affidavit and examination of Crandall, and there is no dispute in the testimony either as to the conversation itself having taken place or as to what Gillespie told Crandall, so that this must be taken as true.   As to this matter, Mr. Crandall says that he was then on his way to California and had purchased his ticket; that on the morning of the 28th he interviewed Gillespie in Omaha and questioned him regarding the trip of Mr. Swenson and Mr. Johnson to Spencer, Iowa, at the time of procuring the notes in controversy, and that Gillespie told

him that he (Gillespie) was at Spencer at the time Mr. Swenson and Mr. Johnson, who is Swenson's attorney, were at Spencer; that Mr. Johnson went to Spencer with Mr. Swenson as Swenson's attorney, and that the purpose of the trip was to get the notes from him (Crandall) in exchange for the note of $8,700.00 which Barber and Crandall had given Swenson some time before; that Gillespie also told Crandall that the purpose of getting the new notes for the larger note was to get one for $2,500.00 for him (Gillespie), which amount Trowbridge was owing him and which should be turned over in payment of the debt; that Gillespie also told him that Swenson had not advanced any money on account of the $8,700.00 note, or on the notes in controversy, to Trowbridge; that both Johnson and Swenson while at Spencer appeared to be very uneasy and when they left town with their automobile they picked him (Gillespie) up at the hotel and, instead of going down the main street, they went out of town on a back street; that when he was informed of these matters by Swenson he came to the conclusion that they had been guilty of dishonesty in procuring the notes, as Swenson had told him at the time the notes in controversy were given that he had advanced the money on the $8,700.00 note and turned the same in at Trowbridge's office in Omaha. He says that when informed of these matters by Gillespie, he concluded that neither Swenson nor Johnson were acting honestly in the matter and that the transfer of the notes was for the purpose of putting Swenson and Gillespie in the position of innocent purchasers of negotiable paper. He also says that Gillespie told him that he would help him and would state all the facts:

It appears in the record that Gillespie had negotiated the $2,500.00 note to the defendant Savings Bank about September 10, 1912. This note had been indorsed by Trowbridge to Swenson, and by Swenson to Gillespie.

Crandall also states that after the conversation with Gillespie he concluded for the first time to bring suit against Swenson to recover the notes; that he went to the telegraph

office at about 9:35 o'clock in the morning, which was soon after the conversation with Gillespie, and telegraphed Mr. Heald as follows: "Auto deal off—Don't deliver car—Starting suit to recover notes." He also telegraphed to F. F. Faville to start suit against Swenson to recover notes and see Heald; that at 9:45 that morning he took the train for California. He says that he did not have time to look Swenson up after the conversation with Gillespie, and that he supposed Swenson had already started for Spencer.

These are the main facts. There may be some others which will be referred to later. We are satisfied from the record that up to the time of the conversation between Crandall and Gillespie there was no bad faith on the part of plaintiffs or their attorney in the negotiations with Swenson; neither was there any bad faith after that time. Crandall testifies that up to that time, and at the time of the conversation with Swenson on the 27th of October, he fully intended to let Swenson have the car, the price to be agreed upon between Swenson and Heald. The $1,200.00 note did not become due until December 26, 1912, and it is argued by appellant that the negotiation in regard to trading the automobile for the note not yet due was unusual, but the evidence shows that Crandall had ordered an automobile some time before and was having trouble to get it; that both plaintiffs were hard pressed for funds and their credit had become impaired because of the California deal and they were anxious to turn the automobile on the note; Swenson lived in another state, and it would take some time for the parties to make the turn.

It is argued by appellant that the plaintiffs and their attorney, Heald, assumed a friendly attitude towards Swenson for the purpose of misleading him. The record shows that, while plaintiffs believed that Swenson was concerned in the fraud, they had no proof of that fact up to the time of the conversation with Gillespie. As some of the witnesses put it, they concluded that Swenson, Trowbridge and Gillespie would all stand together.

Appellees admit that they were investigating the matter and that they went to Swenson and his attorney; that they questioned Swenson at different times about there being anything crooked in connection with his holding the note, and that Swenson admitted that it was a crooked transaction, but as the witnesses put it, he did not admit that he was crooked about it. Swenson was assuring them all the time that he had been acting in good faith and was an innocent purchaser of the notes. There was nothing underhanded or concealed about what plaintiffs did. They went directly to Swenson's attorney, Johnson, and told him that a fraud had been perpetrated upon them and inquired of him regarding Swenson's knowledge of Trowbridge's failure to send the money, and as to whether Swenson had paid any money to Trowbridge. Johnson himself says in his affidavit that Crandall and Heald stated to him that they were out investigating the whole transaction and asked for the address of Swenson, which Johnson gave them. Both Swenson and Johnson led plaintiffs to believe that Swenson was an innocent purchaser and had gotten the notes from Trowbridge for a large sum of money he had loaned him previous thereto.

It is urged by appellees that when Crandall had the conversation with Gillespie on the morning of October 28th, this was the first time they had any tangible proof to substantiate their suspicions of Swenson's participation in the fraudulent transaction of the notes. Swenson and Johnson both filed their affidavits on this hearing, but neither of them deny Gillespie's statement to Crandall that they acted as Gillespie described while in Spencer. The matters referred to by Gillespie have a bearing on the question as to whether Swenson was an innocent holder of the $1,200.00 note and as to whether he participated in the fraud alleged to have been perpetrated upon plaintiffs by Trowbridge and Gillespie.

Counsel for appellant place stress on the fact that some of the earlier letters from Crandall to Swenson suggest that Swenson assist them in disposing of the California land, but

this was after Swenson and Johnson had assured Crandall of Swenson's entire innocence in connection with the alleged fraud. Plaintiffs had become considerably involved by attempting to handle the California land. Swenson was, it appears, a person who was loaning money and was engaged in such transactions, and he was perfectly willing to assist them. Plaintiffs seem to have believed that if they could handle the California land and secure the title they could save the land and their loss would be less and they could make a profit on the land. It is contended by the appellant that plaintiffs and Heald had been scheming for some three weeks to induce him to go to Spencer, but there is nothing in the record anywhere that plaintiffs or their attorney at any time made a suggestion even that appellant go to Iowa until the evening of October 27th. As already stated, the evidence of Crandall and Heald is, that the parties had not agreed upon the price of the automobile. Crandall was then on his way to California, and, if they had not agreed upon the price, there was nothing Crandall could do except to leave the matter of price for further negotiations between Swenson and Heald. Crandall says that at that time he fully intended to deliver the machine to Swenson when the price should be agreed upon. Appellant's theory is, that the sole purpose of his going to Spencer was to get the car and surrender the note; that the terms had already been agreed upon, and the only thing to do was to make the exchange. If this be true, there was no necessity for Swenson going to Spencer. He could have sent someone else for the car, or he could have had the car shipped to him, or Swenson could have refused to deal for the car unless it was brought to Omaha, so that in this way appellant could have frustrated any such scheme by any of the methods just suggested.

Other circumstances are referred to in argument at considerable length, but the opinion is already too long, and we shall not pursue the subject further. Our conclusion is that it has not been shown that appellant was fraudulently induced

to come into the jurisdiction, but that his appearance in Iowa was voluntary. The trial court so held, and the ruling is, therefore,—*Affirmed.*

DEEMER, C. J., EVANS, WEAVER and LADD, JJ., concur.